No. 23-40338

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ANDRE LOUIS KELLER,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

_____

BRIEF FOR APPELLANT

_____

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

# CERTIFICATE OF INTERESTED PERSONS

United States v. Andre Louis Keller,
No. 23-40338

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

1. The Honorable David S. Morales, United States District Judge.

2. Andre Louis Keller, Defendant-Appellant.

3. United States of America, Plaintiff-Appellee.

4. Counsel for Plaintiff-Appellee: United States Attorney Alamdar S. Hamdani; former United States Attorney Jennifer B. Lowery; and Assistant United States Attorneys Amanda Lee Gould and Carmen Castillo Mitchell.

5. Counsel for Defendant-Appellant: Federal Public Defender Marjorie A. Meyers; and Assistant Federal Public Defenders Christopher A. Jenkins and Kathryn Shephard.

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

s/ Kathryn Shephard
KATHRYN SHEPHARD

# REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Andre Louis Keller requests oral argument. The appeal raises significant legal issues about the district court's denial of Mr. Keller's motion to suppress evidence, including whether the dog sniff in the primary lane of the immigration checkpoint qualified as a Fourth Amendment search based on the dog's training and behavior, and whether the dog's behavior in primary gave rise to the presumption of probable cause when the dog did not perform a true alert by sitting, its trained behavior. Counsel therefore believes that oral argument would be beneficial to the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

REQUEST FOR ORAL ARGUMENT ............................................................... ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF CITATIONS ....................................................................................v

STATEMENT OF JURISDICTION .....................................................................1

STATEMENT OF THE ISSUE .............................................................................2

STATEMENT OF THE CASE .............................................................................3

    A.     Indictment. ...........................................................................................3

    B.     Motion to suppress evidence and suppression hearing. .......................3

          1.  The video evidence .......................................................................4

          2.  The testimony of the government's witnesses ...............................8

    C.     Conditional guilty plea, sentencing, and appeal. ...............................16

SUMMARY OF THE ARGUMENT ...................................................................17

ARGUMENT ....................................................................................................18

    **ISSUE RESTATED**: The district court reversibly erred by denying
    Mr. Keller's motion to suppress evidence. ...................................................18

    A.     Standard of review. ............................................................................18

    B.     Agent Sandoval and K-9 Jagus's conduct in the primary lane of
         the immigration checkpoint constituted an unlawful Fourth
         Amendment search of Mr. Keller's vehicle. ......................................18

1. Because K-9 Jagus was trained to detect lawful activity, his sniff was a Fourth Amendment search, and an unlawful one due to the lack of probable cause or consent. ................................20

2. Agent Sandoval and K-9 Jagus's conduct in the primary lane also constituted an impermissible Fourth Amendment search because it amounted to a trespass. .................................................23

C.   Alternatively, K-9 Jagus's behavior in the primary lane did not provide probable cause to search Mr. Keller's vehicle ......................25

CONCLUSION ........................................................................................34

CERTIFICATE OF SERVICE ................................................................35

CERTIFICATE OF COMPLIANCE ......................................................36

# TABLE OF CITATIONS

**Page**

## CASES

*Byrd v. United States*, 138 S. Ct. 1518 (2018) ........................................................ 26

*Florida v. Harris*, 568 U.S. 237 (2013) ............................................. 22, 26-27, 31

*Florida v. Jardines*, 569 U.S. 1 (2013) .................................................................. 25

*Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177 (2004) ................................................ 26

*Illinois v. Caballes*, 543 U.S. 405 (2005) ......................................................... 19-21

*Kyllo v. United States*, 533 U.S. 27 (2001) ...................................................... 20-21

*People v. McKnight*, 446 P.3d 397 (Colo. 2019) ............................................. 21-22

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................................... 18

*State v. Dorff*, 526 P.3d 988 (Id. 2023),
  *cert. denied*, No. 22-1226,
  2023 WL 6379020 (U.S. Oct. 2, 2023) ........................................................... 24-25

*State v. Rebo*, 482 P.3d 569 (Id. 2020),
  *as amended* (Mar. 23, 2021) ............................................................................ 24

*United States v. Alvarez*, 40 F.4th 339
  (5th Cir. 2022) ................................................................................................... 18

*United States v. Braddy*, 11 F.4th 1298
  (11th Cir. 2021) .............................................................................................. 32-33

*United States v. Dovali-Avila*, 895 F.2d 206
  (5th Cir. 1990) .................................................................................... 19, 22, 29-31

*United States v. Gonzalez*, 781 F.3d 422
  (8th Cir. 2015) .................................................................................................... 27

**CASES – (cont'd)**

*United States v. Ho*, 94 F.3d 932
(5th Cir. 1996) ................................................................ 18

*United States v. Jones*, 565 U.S. 400 (2012) ........................... 23-24, 26

*United States v. Lozano*, 761 Fed. Appx. 444
(5th Cir. 2019) (unpublished) ............................................... 22

*United States v. Machuca-Barrera*, 261 F.3d 425
(5th Cir. 2001) ......................................................... 19, 22

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ..................... 19

*United States v. McKinney*, 980 F.3d 485
(5th Cir. 2020) ......................................................... 18, 26

*United States v. Olotoa*, 714 Fed. Appx. 639
(9th Cir. 2017) (unpublished) ............................................... 27

*United States v. Ortiz*, 422 U.S. 891 (1975) ......................... 19, 22

*United States v. Parada*, 577 F.3d 1275
(10th Cir. 2009) ....................................................... 32-33

*United States v. Perez*, 29 F.4th 975
(8th Cir. 2022) ............................................................ 27

*United States v. Place*, 462 U.S. 696 (1983) ......................... 19-21

*United States v. Richmond*, 915 F.3d 352
(5th Cir. 2019) ............................................................ 23

*United States v. Rivas*, 157 F.3d 364
(5th Cir. 1998) ................................................. 18-19, 29-30

**CASES – (cont'd)**

*United States v. Simon*, 937 F.3d 820
  (7th Cir. 2019) .................................................................. 28-29

*United States v. Trejo*, 551 Fed. Appx. 565
  (11th Cir. 2014) (unpublished) ........................................... 27

*United States v. Tuton*, 893 F.3d 562
  (8th Cir. 2018) .................................................................. 32-33

*United States v. Wright*, 57 F.4th 524
  (5th Cir. 2023) .................................................................. 18, 29

**CONSTITUTIONAL PROVISION**

U.S. Const. amend IV ................................................................ *passim*

**STATUTES AND RULES**

8 U.S.C. § 1324(a)(1)(A)(ii) ..................................................... 3

8 U.S.C. § 1324(a)(1)(A)(v)(II) .................................................. 3

8 U.S.C. § 1324(a)(1)(B)(ii) ..................................................... 3

18 U.S.C. § 3742 .................................................................. 1

28 U.S.C. § 1291 .................................................................. 1

Fed. R. App. P. 4(b)(1)(A)(i) .................................................. 1

Fed. R. App. P. 4(b)(2) ......................................................... 1

Fifth Cir. R. 28.2.1 ............................................................... i

**MISCELLANEOUS**

3 W. Blackstone, *Commentaries on the Laws of England* \*211 (1768) ................ 24

Br. for Petitioner, *Florida v. Harris*, 568 U.S. 237,
   2012 WL 3027354 (June 25, 2012) ...................................................... 31

W. Keeton, D. Dobbs, R. Keeton, & D. Owen,
   *Prosser & Keeton on the Law of Torts* 87 (5th ed. 1984) .................................... 24

*Restatement (First) of Torts* § 217 (1934) ........................................... 24

*Restatement (Second) of Torts* § 217 (1965) ...................................... 24

*United States v. Martinez*, S.D. Tex. No. 22-cr-509,
   5th Cir. No. 23-40366 ............................................................... 4

# STATEMENT OF JURISDICTION

Jurisdiction of this Court is invoked under 28 U.S.C. § 1291, as an appeal from a final judgment of conviction and sentence in the United States District Court for the Southern District of Texas, and under 18 U.S.C. § 3742, as an appeal of a sentence imposed under the Sentencing Reform Act of 1984.

The judgment appealed from was entered on the docket on June 5, 2023. Mr. Keller timely filed his notice of appeal on June 2, 2023, after the announcement of judgment and sentence on May 31, 2023. *See* Fed. R. App. P. 4(b)(1)(A)(i), (b)(2).

## STATEMENT OF THE ISSUE

Whether the district court reversibly erred by denying Mr. Keller's motion to suppress evidence.

# STATEMENT OF THE CASE

## A.    Indictment.

On August 24, 2022, a federal grand jury in the Corpus Christi Division of the United States District Court for the Southern District of Texas returned a single-count indictment charging the defendant-appellant, Andre Louis Keller, with "knowingly and in reckless disregard of the fact that Rey David Garcia-Millan[] was an alien who had come to, entered, and remained in the United States in violation of law, transport[ed], move[d], attempt[ed] to transport, and attempt[ed] to move said alien within the United States in furtherance of such violation of law by means of a motor vehicle," in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (a)(1)(A)(v)(II), and (a)(1)(B)(ii). ROA.18.

## B.    Motion to suppress evidence and suppression hearing.

On September 9, 2022, Mr. Keller filed a motion to suppress evidence. ROA.24-27. The government filed a response. ROA.29-33. The district court held a motion hearing on December 19, 2022, at which Border Patrol agent and K-9 handler Jesse James Sandoval (ROA.456-538), and Matthew B. Devaney, the research and development coordinator for the Border Patrol Canine Academy (ROA.616-685), testified for the government. Andre Falco Jimenez, a trainer of police dogs for 30 years, testified as an expert witness for the defense (ROA.539-612, 682-685). After the hearing, the district court granted the parties' motions to supplement the record

with the primary lane video (Defendant Exhibit 1) and the suppression hearing transcript (Government Exhibits 4-5 at ROA.728-955) from *United States v. Martinez*, S.D. Tex. No. 22-cr-509.[1] ROA.96, 100, 125. (Delaney and Jimenez testified at that hearing as well.) The parties filed post-hearing briefs. ROA.103-122 (Defendant's Brief and Argument Regarding Defendant's Motion to Suppress); ROA.126-150 (United States' Closing Brief in Opposition to Defendant's Motion to Suppress Evidence); ROA.395-398 (Defendant's Supplemental Brief). In a written order, the district court denied Mr. Keller's motion. ROA.401-415.

    *1. The video evidence.*

On July 30, 2022, at about 6:45 pm, Agent Sandoval and his K-9 Jagus[2] were working at the fixed immigration checkpoint in Falfurrias, Texas, and Jagus was conducting "regular free air sniffs" in the primary lanes. ROA.469. Government Exhibit ("GX") 1 is a 56-second video without audio of the primary lanes at that time. ROA.469-470. At the beginning of the video, Sandoval and Jagus are in the far upper right corner. Jagus is on a leash that Sandoval is holding. There are two lanes of traffic, and Sandoval and Jagus are to the right of the right lane. At about 00:08, Sandoval and Jagus begin walking to the left. They cross the first, right lane of traffic, and they follow a GMC SUV (the driver is later identified as Mr. Keller)

---

[1] *United States v. Martinez* is before this Court in 5th Cir. No. 23-40366. *Martinez* involves different facts and presents different issues on appeal.

[2] The transcript misspells the K-9's name as "Jagis."

that is entering the checkpoint in the second, left lane. GX1 00:08-00:19. Jagus goes to the driver's side rear tire, to the rear bumper, back to the driver's side rear tire, and back to the bumper. GX1 00:20-00:27. At 00:27, the GMC stops at the checkpoint window, and Jagus puts his paws on the GMC's rear bumper for about three seconds. GX1 00:27-00:31. Jagus does not sit. GX1 00:31-00:45.

While the GMC is stopped at the window, another agent interacts with Mr. Keller. GX1 00:28-00:35. At about 00:36, Mr. Keller's GMC begins to drive forward again, and is no longer visible after the 00:42 mark. GX1 00:36-00:42. Jagus appears to be watching the GMC drive away, while wagging his tail, but he does not sit. GX1 00:31-00:45. At about 00:44, Jagus turns toward the next vehicle in line, a law enforcement vehicle, and begins to exhibit similar behaviors near the bumper of that vehicle as he did when he was first near the GMC's bumper, at which point the clip ends. GX1 00:45-00:56.

GX2 is a 17-minute video without audio of the secondary inspection area. ROA.474. It begins with Mr. Keller's GMC pulling into a parking spot. GX2 00:00-00:14. Agents approach the driver's side door, communicate with Mr. Keller, and at about 00:45, Mr. Keller opens the driver's side door and gets out of the GMC. GX2 00:45-50. An agent takes something out of Mr. Keller's pocket and points to where Mr. Keller should go, while another agent closes the door, leaving it slightly ajar. GX2 00:50-1:04. Three agents accompany Mr. Keller in the direction where the

agent pointed. GX2 1:05-1:07. At 1:08, another agent opens the driver's side door, and starting at 1:12 he puts his head and torso inside the GMC for about 9 seconds. GX2 1:12-1:21. This is a still shot of GX2 at 1:12:



The agent removes his head and torso from the GMC and closes the door. GX2 1:21-1:27. For the next few minutes, agents can be seen doing various things outside the GMC. GX2 1:28-4:42. Then for about five minutes, the GMC is sitting there, and nothing happens. GX2 4:42-9:56.

At 9:56, an agent (identified at the hearing as Agent Sandoval) opens the driver's side door. GX2 9:56-9:59. He puts his head and torso inside the GMC, as shown in the still shot below, for about four seconds, takes his head and torso outside

the GMC for about three seconds, and then puts his head and torso back inside the GMC for another two or three seconds. GX2 10:00-10:10.



At 11:03, the agent appears again with his K-9 (identified at the hearing as K-9 Jagus). The agent taps on the GMC as he and the K-9 circle it. GX2 11:03-11:25. At 11:26, the K-9 briefly sits at the rear bumper on the driver's side. The agent opens the back hatch, and the K-9 jumps inside. GX2 11:28-11:11:55. The agent rewards the K-9 with his toy, and they play tug-of-war. GX2 11:55-12:22. Two other agents come over and look inside the back of the GMC. GX12:22-12:12:42. Another agent and his K-9 come up along the driver's side door, immediately go to the back of the GMC with its open hatch, the K-9 appears (from its shadow) to put its front paws

onto the back of the GMC and then sit, the agent rewards the K-9 with its toy, and they play tug-of-war. GX2 12:42-13:07. An agent closes the GMC's back hatch. GX2 13:07. Over the next three minutes, two other agents with their K-9s, one after the other, come up along the driver's side front door, the agents tap on the GMC as they circle it with their K-9s, the K-9s sit at the driver's side rear bumper, the agents reward the K-9s with their toys, and they play tug-of-war. GX2 13:20-15:03.

In the video's remaining two minutes, various agents are seen coming and going, opening and closing various doors and the back hatch, and removing items from the cargo area. GX2 15:03-17:15. In the last seven seconds, a man in handcuffs (who had been found in the cargo area) exits through the back hatch and an agent escorts him away from the GMC. GX2 17:15-17:22.

### 2. *The testimony of the government's witnesses.*

Agent Sandoval testified that he had been a Border Patrol agent since September 2019, and certified as a K-9 handler in September 2021. ROA.457. He described Border Patrol's training and certification process for becoming a K-9 handler, the biweekly maintenance training, and the annual recertification process. ROA.457-468. Sandoval was not trained by any agency other than the Border Patrol. ROA.491. K-9 Jagus was trained to detect marijuana, cocaine, methamphetamine, heroin, ecstasy, and the presence of concealed humans. ROA.463.

Matthew Delaney, the research and development coordinator for the Border

Patrol Canine Academy, testified that he had been doing that job since 1992. ROA.616. Mr. Delaney went to college briefly and did not have a degree. ROA.616-617. He was a master trainer in patrol for the North American Police Work Dog Association. ROA.620-621. Through that organization, he was accredited as a master trainer in many training disciplines—"patrol which is inclusive of building search, area search, aggression (indiscernible), things like that"; "narcotics detection"; "accelerant detection which is the use of dogs in arson scenes"; "[c]adaver or human remains detection which is searching for the signs of human remains"; "[w]ildlife detection"; and "most recently the new therapy dog certification," ROA.620-621—but not the detection of concealed humans.

Border Patrol differentiates between an "alert" and an "indication." ROA.481-482, 623-624. Delaney defined an "alert" as "a change of body posture and an increased respiration when the dog first encounters the odors he has been trained to detect"—"a combination of instinctual behaviors unique to the K-9 that are displayed when the dog encounters a trained odor he specifically associates with a reward." ROA.623. Delaney testified that a change in posture is not something that's trained. ROA.672. The change in posture or wagging the tail quicker are "natural and instinctual behaviors to an odor the dog associates with a reward." ROA.674. The relevant change in posture "[d]epends on the dog." ROA.674. Only the "instructors and handlers that know the dog" know the dog's relevant change in

posture. ROA.674. Agent Sandoval likewise testified an "alert" is "unique to the dog," and Jagus's "alert" was something Sandoval had to learn by working with him. ROA.481-482.

In Mr. Keller's case, Sandoval testified that Jagus "alerted" in the Border Patrol sense in the primary area. ROA.471-472 (testifying about GX1). Delaney testified that he could not tell from watching the GX1 and GX2 videos that Jagus was alerting. ROA.676.

Delaney defined an "indication" as "a trained behavior," either passive, such as sitting or pointing, or active/aggressive, such as scratching or biting. ROA.623-624. Sandoval also defined an indication as the dog's trained behavior, and Jagus's indication was to sit. ROA.476, 481. Delaney testified that an "alert" is more probative than an indication because a handler can't cue an "alert." ROA.625. He further testified that a dog may not indicate in the field for any number of reasons, ranging from inability to pinpoint the source, handler safety issues, and policy reasons. ROA.625-627.

All Border Patrol K-9s are trained to indicate. ROA.678. When asked, "why bother," Delaney responded, "Because an indication is when the dog actually gets to the actual source of odor, and provides a trained pinpointing behavior." ROA.679. When confronted with his testimony that he wasn't interested in the indication and that he's interested in the alert, Delaney clarified, "I didn't say I wasn't interested in

the indication. I said the alert was more probative." ROA.679. When asked "what's the point of the indication," Delaney said, "The indication is a trained behavior that pinpoints the source, and it kind of ends the exercise. The dog provides a good indication behavior and we reward that. But there are many situations where a dog can't indicate." ROA.679. Delaney testified that "[y]ou have to have the alert before the indication" because otherwise the indication could be because the dog is "tired, or just wants to sit down for a minute." ROA.679. When asked to explain what he meant by the alert being more probative than the indication, Delaney responded, "It means it is more of an indicator of the presence of trained substance than the indication." ROA.680.

Border Patrol K-9s are not only trained to indicate, but are tested and certified based on indicating. Agent Sandoval testified that, for the certification process, the K-9 does 17 searches and "can only get one miss and false indication" to pass. ROA.493. Sandoval testified that the evaluators are "always changing," ROA.464, and Delaney testified that the evaluators are "changing all the time," ROA.643, but that a particular K-9's unique alert is only known to people who spend enough time working with the dog, ROA.481-482, 674, 676. Delaney further explained that "unless logistically impossible, the person who conducts the certification is not the person who is currently engaged in doing a maintenance training." ROA.652-653. When describing the evaluation process, Delaney repeatedly described the K-9's

behavior as "alerts and indicates." ROA.672-673. And when describing the process for training dogs to detect concealed humans, Delaney testified that it includes the dog indicating before being rewarded: concealed people are introduced by "basically show[ing] the dog [the] reward object, run[ning] behind a door, let[ting] the dog run to the door, and then he performs an indication, the person hiding provides the reward." ROA.638-639.

Border Patrol does not keep any operational or deployment records of K-9 performance in the field. ROA.500-504, 655-657. Sandoval testified that it has happened that Jagus alerted to a vehicle and no contraband was found, but he did not know how many times and could not even give a rough estimate. ROA.501-502. Sandoval agreed that "usually when [Jagus] alerts and then indicates" at the checkpoint, he finds what Jagus has been trained to detect. ROA.534. It is "very rare" when they don't find anything. ROA.533-534. During a normal shift, Jagus alerts once, and "might even go a few days without an alert." ROA.537-538. A reasonable estimate was that one or two vehicles are searched per day based on an alert from Jagus. ROA.538.

The "secondary sniff" is a critical part of Border Patrol's protocol. Sandoval testified that he went to secondary after another K-9 team relieved him in primary, and he would search Mr. Keller's GMC after his K-9 alerted in secondary "once all visible occupants" were "removed from that vehicle in [s]econdary." ROA.473.

When he arrives at secondary, Sandoval does "what's called a 'pre-search'" where he "go[es] in there and . . . look[s] for visible occupants." ROA.473. Working at the checkpoint, he has seen people leave unattended, sleeping children, knives, guns, or even dogs in their vehicles, and does the "pre-search" for his safety reasons. ROA.473. After conducting his "pre-search" of Mr. Keller's GMC, Sandoval retrieved his K-9 from his vehicle to do the "systematic search." ROA.475. He continues the systematic search until his "K-9 partner alerts or if he does not alert, I walk away." ROA.474-475. Delaney likewise testified that a vehicle would not be searched "until the secondary sniff is conducted with all visible occupants outside the vehicle and then another alert occurred." ROA.670.

As for concealed human detection, Sandoval did not know what the smell difference was between somebody who was concealed and somebody who was not concealed. ROA.486. When asked to define "concealed person," Delaney responded, "A person that is concealed from view of the dog, I suppose." ROA.668. Delaney agreed that the K-9 is trained to "alert to somebody he can't see." ROA.668. When asked if the K-9 will alert to a car containing a person the K-9 cannot see, Delaney responded, "No, I don't think so." ROA.669. When asked how the K-9 picks which car to alert to, Delaney responded, "We don't know." ROA.669. Delaney answered "Yes, sir" to both of the following questions: (1) if there was "a baby in a car carrier that the dog can't see[, . . .] might [the K-9] alert to that car

because there's a baby in a car seat?" and (2) "If there's somebody taking a nap in the back of the seat under a blanket, the dog might alert to that person?" ROA.669. Delaney further agreed that there was nothing illegal about a baby in a car seat or a citizen napping in the back of a car, and that there is nothing illegal about a person in the sleeper compartment of a tractor-trailer. ROA.669-670. Delaney was then asked, "But your dog[s] will alert to those because they can't see them"? and responded, "Yes, that's why we do the secondary sniff." ROA.670. Delaney explained that a vehicle would not be searched "until the secondary sniff is conducted with all visible occupants outside the vehicle and then another alert occurred." ROA.670.

Delaney testified that the protocols for training dogs to detect concealed humans are similar to the training used for disaster dogs that identify people buried in rubble, such as after the 9/11 terrorist attacks. ROA.638. The training begins with K-9s "work[ing] by people sitting in cars all the time." ROA.638. Then concealed people are introduced by "basically show[ing] the dog [the] reward object, run[ning] behind a door, let[ting] the dog run to the door, and then he performs an indication, the person hiding provides the reward." ROA.638-639. Then the training is done "with people in the vehicles and [the dog] sees somebody run into the vehicles," and "the dog [is worked] past those people to the concealed person." ROA.638. Delaney didn't know "how the dogs make this determination," but "they do, and they do it

successfully." ROA.639. "Also built into [the] program is the procedure of the secondary step at checkpoints following primary alerts." ROA.639. Delaney testified that there was "very rarely any issue" in Border Patrol with K-9s detecting concealed humans. ROA.640.

In the beginning, the K-9s trained to detect concealed humans and controlled substances were stationed at secondary, and would sniff vehicles after reasonable suspicion was developed at primary. ROA.657. But the K-9s would alert and drag their handlers to primary, and they'd find concealed people and controlled substances. ROA.657-658. "And so basically the dogs told [Border Patrol] they could do this. And so [Border Patrol] developed a training protocol to include ignoring visible people and all that, to document and facilitate actively training dogs to do the pre-primary work." ROA.657. When asked how Border Patrol made sure the K-9s in fact alert to concealed humans, rather than human scent, Delaney responded that (1) human scent is everywhere, K-9s are exposed to it all day every day, and are not rewarded for it; and (2) they "take human scent samples such as soiled clothing and things of that nature, and hide them in vehicles and ensure the dogs bypass human scent samples." ROA.658-659.

As for the certification process, Sandoval testified that the K-9 had to be tested on concealed humans. ROA.494. When the test involves a concealed human, after the K-9 alerts, the instructors tell Sandoval, Sandoval puts Jagus on a short leash and

brings him into a sit, and the person "comes out of hiding and rewards for me." ROA.494-495. At Sandoval's recertification in September 2021, one of the tests involved a person hidden in the trunk of a vehicle, but he did not remember if anyone else was in the vehicle. ROA.495. Sandoval identified GX3 (ROA.33) as the September 21, 2021, letter from Border Patrol for his recertification with Jagus that was in effect when Sandoval stopped Mr. Keller's GMC. ROA.532-533.

**C.  Conditional guilty plea, sentencing, and appeal.**

On March 7, 2023, Mr. Keller entered a conditional guilty plea, expressly preserving his right to appeal the suppression ruling. ROA.689, 700-704. The parties entered into a written plea agreement in which Mr. Keller waived his right to appeal, except the motion to suppress (and an ineffective-assistance claim). ROA.422-424.

On May 31, 2023, the district court sentenced to Mr. Keller to 20 months in the custody of the Bureau of Prisons, to be followed by three years of supervised release. ROA.724. The court waived imposition of a fine and the Justice for Victims of Trafficking Act assessment, but imposed the $100 special assessment. ROA.724.

On June 2, 2023, Mr. Keller timely filed a notice of appeal. *See* ROA.428-429; *see also* ROA.433 (judgment entered June 5, 2023). In this appeal, Mr. Keller argues that the district court reversibly erred by denying his motion to suppress evidence.

## SUMMARY OF THE ARGUMENT

The district court reversibly erred by denying Mr. Keller's motion to suppress evidence. In this case, Mr. Keller was in the primary lane of an immigration checkpoint when K-9 Jagus sniffed and put his paws on Mr. Keller's GMC without his consent and without a warrant. That sniff constituted a Fourth Amendment search because K-9 Jagus was trained to detect legal activity. K-9 Jagus's putting his paws on Mr. Keller's GMC in primary, together with Agent Sandoval's intent to gather information, also constituted a Fourth Amendment search because it amounted to a trespass. Since the government lacked probable cause to search Mr. Keller's GMC in the primary lane, the district court erred by denying his motion.

Alternatively, K-9 Jagus's behavior in the primary lane did not provide probable cause to search Mr. Keller's vehicle in the secondary area before K-9 Jagus performed his secondary sniff with all visible occupants removed, for two reasons. First, the government failed to prove that K-9 Jagus was certified to detect concealed humans in the primary area by a "bona fide organization." Second, K-9 Jagus never performed his trained indication behavior of sitting in the primary lane, and thus his behavior there did not qualify as a true alert giving rise to the presumption of probable cause.

For any of these reasons, the Court should vacate Mr. Keller's conviction and remand for further proceedings.

**ARGUMENT**

**ISSUE RESTATED:** The district court reversibly erred by denying Mr. Keller's motion to suppress evidence.

## A.     Standard of review.

"When reviewing the denial of a motion to suppress, [this Court] review[s] questions of law *de novo* and findings of fact for clear error." *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020). "The ultimate determination of probable cause" is "a question of law subject to *de novo* review." *United States v. Ho*, 94 F.3d 932, 936 (5th Cir. 1996). Although the Court "view[s] the evidence in the light most favorable to the party that prevailed in the district court," *id.* at 491, the record contains "a videotape capturing the events in question," and so the Court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007); *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023).

## B.     Agent Sandoval and K-9 Jagus's conduct in the primary lane of the immigration checkpoint constituted an unlawful Fourth Amendment search of Mr. Keller's vehicle.

"The Fourth Amendment prohibits unreasonable searches and seizures." *Wright*, 57 F.4th at 530. "Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). The government bears the burden to demonstrate the constitutionality of a warrantless search or seizure. *Wright*, 57 F.4th at 530; *United*

18

*States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

The Supreme Court has approved of the government's warrantless, suspicionless seizure of a vehicle at a fixed interior immigration checkpoint "for brief questioning of its occupants." *United States v. Martinez-Fuerte*, 428 U.S. 543, 545 (1976). But the Fourth Amendment prohibits the government from *searching* a vehicle at a checkpoint without probable cause (or consent). *See, e.g.*, *United States v. Ortiz*, 422 U.S. 891, 896-97 (1975); *United States v. Machuca-Barrera*, 261 F.3d 425, 431 (5th Cir. 2001) (explaining that, although suspicionless "stops and questioning" are permitted at immigration checkpoints, "searches or 'further detention . . . must be based on consent or probable cause'") (quoting *Martinez-Fuerte*, 428 U.S. at 567); *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990) (though vehicle seizures are permitted at immigration checkpoints, "[w]hat the Fourth Amendment of our Constitution does not permit, however, is a warrantless search of that same vehicle absent either consent or a determination of probable cause").

In two cases, the Supreme Court has held that "a canine sniff by a well-trained narcotics-detection dog" is not a search because it "discloses only the presence or absence of narcotics, a contraband item." *Illinois v. Caballes*, 543 U.S. 405, 409, (2005) (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). The key premise in both *Caballes* and *Place* was that the dog sniff "does not expose noncontraband

items that otherwise would remain hidden from public view." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707). The Court's discussion in *Caballes* of its prior decision in *Kyllo v. United States*, 533 U.S. 27 (2001), makes that clear. In *Kyllo*, the Court had held that the government's "use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search." *Caballes* 543 U.S. at 409 (citing *Kyllo*, 533 U.S. 27). "Critical to that decision," explained the *Caballes* Court, "was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.'" *Id.* at 409-10 (quoting *Kyllo*, 533 U.S. at 38). By contrast, the drug dog sniff at issue in *Caballes* "reveal[ed] no information other than the location of a substance that no individual has any right to possess" and thus "d[id] not violate the Fourth Amendment." 543 U.S. at 410.

1. *Because K-9 Jagus was trained to detect lawful activity, his sniff was a Fourth Amendment search, and an unlawful one due to the lack of probable cause or consent.*

In Mr. Keller's case, K-9 Jagus was trained to detect lawful activity, and thus his sniff of Mr. Keller's vehicle in the primary lane constituted a Fourth Amendment search. Mr. Delaney, the research and development coordinator for the Border Patrol Canine Academy, testified that Border Patrol K-9s trained to detect concealed humans will alert to a baby in a car seat that the K-9 cannot see and will alert a person taking a nap in a vehicle's back seat that the K-9 cannot see, even though

those activities are legal. ROA.669-670. Mr. Delaney further testified that, because the K-9s alert to those legal activities, "that's why" Border Patrol does another sniff in the checkpoint's secondary inspection area, and agents do not search a vehicle until after all visible occupants have been removed and the K-9 alerts again. ROA.670. Agent Sandoval likewise testified that he would not search Mr. Keller's GMC until after his K-9 alerted in secondary, once all visible occupants had been removed from the vehicle. ROA.473. And if his K-9 did not alert again in secondary, he would "walk away." ROA.474-475. Since K-9 Jagus's sniff detects lawful activity, it is just like the thermal-imaging device in *Kyllo* and does not qualify as a "non-search" under *Caballes* and *Place*.

The Supreme Court of Colorado has reached that same conclusion in light of Colorado's legalizing possession by adults at least 21 years old of small amounts of marijuana. *People v. McKnight*, 446 P.3d 397, 401 (Colo. 2019). The Court "review[ed] long-standing law reasoning that a sniff is not a search because an individual has no legitimate expectation of privacy as to contraband," but concluded that since marijuana possession was "no longer always 'contraband' under state law," the K-9's "sniff could detect lawful activity," and therefore "was a search under the Colorado Constitution." *Id.* The Court's analysis centered on the Colorado Constitution, rather than the U.S. Constitution, because marijuana possession remains illegal under federal law, and the K-9 sniff thus did not detect

noncontraband as a matter of federal law. *Id.* at 406. But because the K-9 sniff detected noncontraband under state law, it was a "search" under the state constitution. *Id.* at 406-10.

This Court's unpublished opinion in *United States v. Lozano*, 761 Fed. Appx. 444, 447 (5th Cir. 2019) (unpublished), is not to the contrary. There, the handler testified that his dog alerted to Xanax in the field, "even though not trained or certified to do so." *Id.* at 447. In Mr. Keller's case, it is the dog's training itself, not the field performance, that is at issue. And the relevant testimony is not from the handler about field performance but from Mr. Delaney, the research and development coordinator for the Border Patrol Canine Academy, who testified that trained Border Patrol K-9s alert to lawful activity. ROA.669-670. That distinction makes all the difference in light of the Supreme Court's focus in *Florida v. Harris*, 568 U.S. 237 (2013), on the training and certification of dogs, and critique of the probative value of field performance. *See id.* at 245-47.

Since K-9 Jagus's sniff of Mr. Keller's vehicle in the primary lane was a search, the government needed probable cause (or consent) to justify that intrusion. *See Ortiz*, 422 U.S. at 896-97; *Machuca-Barrera*, 261 F.3d at 431; *Dovali-Avila*, 895 F.2d at 207. The government produced no evidence that its agents had any suspicions about Mr. Keller before the K-9 search, nor did the government produce any evidence of consent. Accordingly, the suspicionless, nonconsensual search

violated the Fourth Amendment, and the district court erred by denying Mr. Keller's motion to suppress evidence.

> *2. Agent Sandoval and K-9 Jagus's conduct in the primary lane also constituted an impermissible Fourth Amendment search because it amounted to a trespass.*

Agent Sandoval and K-9 Jagus's interactions with Mr. Keller's vehicle in the primary lane constituted a search for another reason: K-9 Jagus trespassed on Mr. Keller's vehicle when he put his paws on the bumper. GX1 00:27-00:31. In *United States v. Richmond*, 915 F.3d 352, 357 (5th Cir. 2019), this Court recognized that the Supreme Court's trespass-based decision in *United States v. Jones*, 565 U.S. 400 (2012), caused "a sea change" in Fourth Amendment jurisprudence that required courts to now determine whether government conduct amounted to a search because it was a "trespass . . . 'conjoined' with 'an attempt to find something or obtain information.'" *Richmond*, 915 F.3d at 357 (quoting *Jones*, 565 U.S. at 408 n.5). The *Jones* trespass test excludes "mere physical touching, such as when an officer leans on the door of a car while questioning its driver, from being a search." *Id.* But if there is both a trespassory touching and intent to gather information, the touching is a search that requires probable cause. *Id.* at 357-60 (holding that an officer's tapping of a vehicle's tire "to learn what was inside" was a search but a lawful one because the officer had probable cause to investigate the misdemeanor offense of operating a vehicle that is "unsafe so as to endanger a person").

In *State v. Dorff*, the Idaho Supreme Court applied *Jones* to hold that a drug dog's physical contact with a vehicle while conducting a "free air" sniff was an unconstitutional search. 526 P.3d 988, 991 (Id. 2023), *cert. denied*, No. 22-1226, 2023 WL 6379020 (U.S. Oct. 2, 2023). The Court reasoned that it was "self-evident that when the State deploys a drug dog to conduct a free air sniff of a vehicle, that activity is conducted for the purpose of obtaining information." *Id.* at 994 (cleaned up). As for the "trespassory touching" part of the *Jones* inquiry, the Court surveyed numerous authorities and determined that the answer was "plain:"

> At common law, a "trespass" to chattel occurs when an actor violates "the dignitary interest in the inviolability of chattels," i.e., those "interests" that comprise the "bundle of sticks" (e.g., the right to use, possess, and exclude). An actor violates such interests "either by intentionally using *or otherwise intermeddling* with a chattel in the possession of another or by continuing to use or intermeddle therewith after a privilege to do so has been terminated." That the trespass is committed by a drug dog—and not its handler—is of no import.

*Id.* at 996 (internal citations and explanatory parentheticals omitted) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on the Law of Torts* 87 (5th ed. 1984); *State v. Rebo*, 482 P.3d 569, 575-76 (Id. 2020), *as amended* (Mar. 23, 2021); *Restatement (First) of Torts* § 217 (1934); *Restatement (Second) of Torts* § 217 (1965); 3 W. Blackstone, *Commentaries on the Laws of England* *211 (1768)). Applying that plain law to the facts of the case before it, the Court held that the dog had "clearly trespassed against [the driver's] vehicle" when "he jumped up onto the door[] and planted his two front paws on the door (and then the window) as he

sniffed the upper seams of the vehicle." *Id.* at 999. The dog's paws on the vehicle, "without privilege or [the driver's] consent," was "enough to objectively constitute a wrongful trespass against, and intermeddling with, [the driver's] vehicle, and his right to exclude." *Id.*

So too in Mr. Keller's case. Just like in *Dorff*, the video shows that K-9 Jagus placed his paws on the bumper of Mr. Keller's vehicle, GX1 00:27-00:31, the obvious purpose was to obtain information, and there is nothing in the record to suggest that he did so in accordance with any privilege or consent. Consequently, Agent Sandoval and K-9 Jagus's trespassory touching of Mr. Keller's vehicle in the primary lane without any suspicion of criminal activity also violated the Fourth Amendment under *Jones* and *Richmond*.

**C.      Alternatively, K-9 Jagus's behavior in the primary lane did not provide probable cause to search Mr. Keller's vehicle.**

Agent Sandoval described as a "pre-search" his and the other agents' physical intrusions inside the interior of Mr. Keller's GMC in the secondary inspection area before K-9 Jagus's secondary sniff. ROA.473. But the video admitted as GX2 demonstrates that those intrusions were in fact a Fourth Amendment "search." GX2 1:12-1:21, 10:00-10:10; *supra* at pp. 5-7. As the Supreme Court has explained "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013)

(quoting *Jones*, 565 U.S. at 405 n.3); *see also, e.g.*, *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) ("One who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it.").

Because the agents' physical intrusions were a search, they must have had probable cause at that time that Mr. Keller's vehicle contained evidence of a crime. *See, e.g.*, *McKinney*, 980 F.3d at 490 (a Fourth Amendment intrusion "must be 'justified at its inception'" and the requisite level of suspicion "must exist *before* the initiation of" a search or seizure) (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). K-9 Jagus's behavior in primary, however, did not provide probable cause, for two reasons.

First, the government failed to prove that K-9 Jagus was certified to detect concealed humans in the primary area by a "bona fide organization." In *Florida v. Harris*, the Supreme Court held that, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." 568 U.S. at 246-47. Put another way, certification by a "bona fide organization" is a condition precedent for the government to invoke the presumption that a dog's alert provides probable cause.

Neither the Supreme Court nor this Court has had occasion to elaborate on what qualifies as a "bona fide organization." In *Florida v. Harris*, the dog was

trained to detect drugs, and had "received a one-year certification from Drug Beat, a private company that specializes in testing and certifying K-9 dogs." *Id.* at 241. The Court also noted that a defendant "must have an opportunity to challenge . . . a dog's reliability" by, for example, "contest[ing] the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty." *Id.* at 248.

The methods for training dogs to detect narcotics are well-established and widely used by organizations other than Border Patrol, and the few federal appellate decisions that have considered "bona fide organization" challenges have all done so in the context of dogs detecting drugs. *See, e.g.*, *United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022); *United States v. Gonzalez*, 781 F.3d 422, 429-30 (8th Cir. 2015); *United States v. Olotoa*, 714 Fed. Appx. 639, 640 (9th Cir. 2017) (unpublished); *United States v. Trejo*, 551 Fed. Appx. 565, 568-70 (11th Cir. 2014) (unpublished). But the record in Mr. Keller's case shows that Border Patrol is the only organization that purports to train dogs to detect "concealed humans" inside vehicles. Mr. Delaney testified that, through the North American Police Work Dog Association, he was accredited as a master trainer in many training disciplines— "patrol which is inclusive of building search, area search, aggression (indiscernible), things like that"; "narcotics detection"; "accelerant detection which is the use of dogs in arson scenes"; "[c]adaver or human remains detection which is searching for the

signs of human remains"; "[w]ildlife detection"; and "most recently the new therapy dog certification," ROA.620-621—but not the detection of concealed humans.

Moreover, Mr. Delaney's own testimony undermined Border Patrol's "bona fides" for certifying dogs to detect concealed people specifically in the primary area. He testified that, because Border Patrol K-9s will alert in primary to lawful activity like a baby in a car seat or a person taking a nap in a vehicle's back seat that the K-9 cannot see, Border Patrol K-9s have to do another sniff in the checkpoint's secondary inspection area, after visible occupants are removed, and the K-9 has to alert again. ROA.670; *accord* ROA.473-475 (Agent Sandoval's testimony that he follows this procedure, followed it in Mr. Keller's case, and would "walk away" if his K-9 didn't alert again in secondary). Delaney further testified that the secondary sniff is part of the training process for Border Patrol canines detecting concealed humans: "Also built into [the] program is the procedure of the secondary step at checkpoints following primary alerts." ROA.639.

The government's theory at the suppression hearing largely boiled down to the training to detect concealed humans must work because Border Patrol finds concealed humans at checkpoints, *i.e*, it must work because it does. But "[p]robable cause is not a retrospective, outcome-based standard. If an officer randomly breaks into a house on only a wild hunch and stumbles into a meth lab, the discovery does not provide probable cause for the search." *United States v. Simon*, 937 F.3d 820,

834 (7th Cir. 2019) (internal citation omitted). Since the government conducted a warrantless search of Mr. Keller's vehicle when it arrived in the secondary area, it bore the burden of proving that the search was justified by probable cause. *See, e.g.*, *Wright*, 57 F.4th at 530; *Rivas*, 157 F.3d at 368. In this case, the government relied exclusively on K-9 Jagus's behavior in primary as presumptively providing probable cause, but failed to prove the "bona fide organization" condition precedent for the presumption to apply. As a result, the search of Mr. Keller's vehicle in secondary violated the Fourth Amendment.

Second, K-9 Jagus's behavior in primary did not provide probable cause to search because he never performed his trained indication behavior of sitting and thus it did qualify as a true alert. As this Court in *Dovali-Avila* explained, "[d]etection dogs . . . are trained to 'alert'—that is, to take a distinctive position or stance, as in the instance of a trained bird dog pointing game—when they detect the scent of drugs or concealed humans." *Dovali-Avila*, 895 F.2d at 207 n.2. The Court further wrote that:

> Dogs assigned to work with border patrol agents are specially trained to detect concealed contraband or hidden people in the vehicles that pass through such checkpoints as that at Sierra Blanca. *The dogs are trained to alert—take a particular position or stance—only when they detect such contraband or people.* When a dog so trained alerts in the near presence of a particular vehicle, that action is sufficient to give rise to probable cause to search that vehicle.

*Id.* at 208 (emphasis added). In *Rivas*, the Court held that, although in other cases a

dog's "alert" was sufficient to create probable cause to search, the "weak alert" or "casting" as it was called in that case, when the dog was trained to perform an "aggressive alert," was insufficient. *Rivas*, 157 F.3d at 368.

The government's evidence in Mr. Keller's case established that all Border Patrol canines are trained to indicate. ROA.678. During training, they are rewarded after they indicate. ROA.638-639, 679 (Mr. Delaney's testimony); *see also* ROA.494-495 (Agent Sandoval's testimony about the test involving concealed humans during the recertification process). Mr. Delaney testified that Border Patrol K-9s are trained to perform either a passive behavior, such sitting or pointing, or an active/aggressive behavior, such as scratching or biting. ROA.623-624. At the Border Patrol Canine Academy, K-9 Jagus was trained to sit when he detected the odor of certain controlled substances or concealed humans. ROA.476, 481.

Yet in the primary area, K-9 Jagus never performed his trained behavior of sitting. GX1 00:00-00:56. He thus never performed a true alert that gave rise to probable cause, like the dog in *Rivas* and unlike the dog in *Dovali-Avila*.

Border Patrol differentiates between an "alert" and an "indication." ROA.481-482, 623-624. According to Border Patrol, an "alert" is the "unique," "instinctual" behavior of a dog that is not trained, "depends on the dog," and can only be learned by working with the dog. ROA.481-482, 623, 672, 674. But the government did not meet its burden in this case to show that K-9 Jagus's "alert" in primary in the Border

Patrol sense, as opposed to a true alert in the *Dovali-Avila* sense, gave rise to probable cause.

The government relied on the presumption from *Florida v. Harris*, that a trained or certified dog's alert provides probable cause. The Supreme Court in that case did not distinguish between "alert" and "indication," instead noting only that the dog in the case before the Court had alerted by "signaling, through a distinctive set of behaviors, that he smelled drugs [at the driver's-side door handle]." *Harris*, 568 U.S. at 240. The State of Florida's briefing, however, demonstrates that the Court was using the term "alert" to mean an indication or a true alert, not an "alert" in the Border Patrol sense: "[Handler] Officer Wheetley led [K-9] Aldo around the truck for a 'free air sniff' of the exterior of the vehicle. Aldo alerted near the driver's side door handle—becoming excited then sitting, as he had been training to do over the course of hundreds of hours in K-9 instruction for certain narcotics[.]" Br. for Petitioner 3, *Florida v. Harris*, 568 U.S. 237, 2012 WL 3027354 (June 25, 2012).

In Mr. Keller's case, the government cannot invoke the *Florida v. Harris* presumption due to the mismatch between its evidence of what K-9 Jagus is trained and certified on, and K-9 Jagus's behavior in the field at primary. K-9 Jagus did not perform his trained indication of sitting while in primary, but the government's evidence established that Border Patrol K-9s are tested and certified based on indicating, not "alerts." Evaluators cannot be testing K-9s based on an "alert" in the

Border Patrol sense—both Agent Sandoval and Mr. Delaney testified that the evaluators for the K-9 team's certification, recertification, and biweekly maintenance training are always changing, and that no one except the people who work with the canine enough knows what a dog's "alert" is. ROA.464, 481-482, 643. In fact, Mr. Delaney testified that he could not tell from watching the GX1 and GX2 videos whether K-9 Jagus had "alerted" in the Border Patrol sense. ROA.676.[3] And Sandoval agreed with the prosecutor's questions that "usually when [Jagus] alerts *and then indicates*" at the checkpoint, he finds what Jagus has been trained to detect. ROA.534 (emphasis added).

Moreover, Border Patrol does not keep any field records. ROA.500-504, 655-657. And the anecdotal evidence presented about field experience would all be based on the results of a secondary sniff, not based on only what happens in the primary lane, since both Mr. Delaney and Agent Sandoval testified that no searches are done until after the K-9s alert in secondary. ROA.473-475, 670.

Out-of-circuit decisions such as *United States v. Braddy*, 11 F.4th 1298 (11th Cir. 2021), *United States v. Tuton*, 893 F.3d 562 (8th Cir. 2018), and *United States v. Parada*, 577 F.3d 1275 (10th Cir. 2009), are not to the contrary. All three involved

---

[3] Although Agent Sandoval testified at one point during cross-examination that Jagus is tested on the "alert," not the indication, ROA.514, that is inconsistent with Sandoval's own testimony indicating that he lacked personal knowledge about how testing was done since he "not a certified K-9 instructor"; his testimony that evaluators are "always changing"; his testimony that an "alert" is "unique" to the dog and that Jagus's "alert" was something he had to learn by working with him; and Mr. Delaney's testimony. ROA.463-464, 481-482, 643, 672-673, 676.

traffic stops with K-9s trained to detect drugs. *See Braddy*, 11 F.4th at 1303-04, 1312-15; *Tuton*, 893 F.3d at 566-67, 571; *Parada*, 1278-79, 1281-83. None involved a Border Patrol checkpoint with K-9s trained to detect narcotics and concealed humans, and none involved K-9s trained to perform a "secondary sniff" after visible occupants had been removed.

In light of the government's evidence and particular facts in Mr. Keller's case, K-9 Jagus's failure to perform a true alert in the primary lane means that his behavior at that point in time did not give rise to probable cause. Without probable cause (or consent), the search of Mr. Keller's vehicle by agents in the secondary inspection area, before K-9 Jagus performed a secondary sniff and sat, violated the Fourth Amendment.

In sum, the district court reversibly erred by denying Mr. Keller's motion to suppress evidence, and this Court should vacate his conviction and remand for further proceedings.

## CONCLUSION

For foregoing reasons, this Court should vacate Mr. Keller's conviction and remand for further proceedings.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

## CERTIFICATE OF SERVICE

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD

# CERTIFICATE OF COMPLIANCE

1.       This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,666 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.       This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 (current version) software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.       This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because the brief has been redacted of any personal data identifiers.

4.       This brief complies with the electronic submission of 5th Cir. R. 25.2.1 because this brief is an exact copy of the paper document.

5.       This document is free of viruses because the document has been scanned for viruses with the most recent version of a commercial virus scanning program.

s/ Kathryn Shephard_____

KATHRYN SHEPHARD
