No. 23-40338


IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,


v.


ANDRE LOUIS KELLER,
Defendant-Appellant.


Appeal from the United States District Court
for the Southern District of Texas


————————————


REPLY BRIEF FOR APPELLANT

————————————


MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.......................................................................i

TABLE OF CITATIONS .................................................................. ii

STATEMENT OF THE REPLY ISSUE ....................................................1

ARGUMENT ...................................................................................2

    **REPLY ISSUE RESTATED**: The district court reversibly erred by denying Mr. Keller's motion to suppress evidence. ........................................2

    A.    The government's brief omits and fails to address key facts about Border Patrol's "secondary sniff" procedure. .......................................3

    B.    The government's brief also omits and fails to address key facts about Border Patrol's training and certification process.....................11

    C.    The government's responses to Mr. Keller's trespass argument are unpersuasive. ..................................................................16

CONCLUSION ...............................................................................25

CERTIFICATE OF SERVICE .............................................................26

CERTIFICATE OF COMPLIANCE.......................................................27

# TABLE OF CITATIONS

**Page**

## CASES

*Byrd v. United States*, 138 S. Ct. 1518 (2018)...................................................... 6

*Florida v. Harris*, 568 U.S. 237 (2013) .......................................... *passim*

*Florida v. Jardines*, 569 U.S. 1 (2013) ........................................... 18, 22

*Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177 (2004)................................................. 10

*Illinois v. Caballes*, 543 U.S. 405 (2005) ................................................. 2, 5

*Kyllo v. United States*, 533 U.S. 27 (2001)........................................... 5-7

*Molina-Martinez v. United States*, 578 U.S. 189 (2016) ................................. 16-17

*People v. McKnight*, 446 P.3d 397 (Colo. 2019)................................... 8-9

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ....................... 17

*State v. Dorff*, 526 P.3d 988 (Id. 2023), *cert. denied*,
  No. 22-1226, 2023 WL 6379020 (U.S. Oct. 2, 2023) .................................... 21-23

*United States v. Acuna*, No. 21-10035-01,02-JWB, 2022 WL 3081419
  (D. Kan. Aug. 3, 2022) ........................................................................... 22

*United States v. Allende-Garcia*, 407 Fed. Appx. 829
  (5th Cir. 2011) (unpublished) .............................................................. 11

*United States v. Anderson*, 658 F. Supp. 3d 1000
  (D. Kan. 2023), *reconsideration denied*, No. 22-10006-01-JWB,
  2023 WL 3092583 (D. Kan. Apr. 26, 2023).................................................... 22-23

*United States v. Calfon*, 607 F.2d 29
  (2d Cir. 1979)...................................................................................... 18

## CASES – (cont'd)

*United States v. Cordero*, No. 5:13-CR-166, 2014 WL 3513181
  (D. Vt. July 14, 2014) .......................................................... 22-23

*United States v. Clayton*, 374 Fed. Appx. 497
  (5th Cir. 2010) (unpublished) ................................................ 11

*United States v. Delgado*, 364 Fed. Appx. 876
  (5th Cir. 2010) (unpublished) ................................................ 11

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ................... 17

*United States v. Dovali-Avila*, 895 F.3d 206
  (5th Cir. 1990)......................................................... 6, 15-16, 19

*United States v. Guidry*, 817 F.3d 997
  (7th Cir. 2016)............................................................... 21

*United States v. Hauk*, 412 F.3d 1179
  (10th Cir. 2005)............................................................. 18

*United States v. Hernandez-Castillo*, 156 F.3d 1245,
  1998 WL 516845 (10th Cir. 1998) (unpublished) ........................ 11

*United States v. Jones*, 565 U.S. 400 (2012) ................................. *passim*

*United States v. Knowles*, 29 F.3d 947
  (5th Cir. 1994)............................................................... 17

*United States v. Lopez*, 923 F.2d 47
  (5th Cir. 1991)............................................................ 17-18

*United States v. Lozano*, 761 Fed. Appx. 444
  (5th Cir. 2019) (unpublished) .............................................. 7-8

## CASES – (cont'd)

*United States v. Lyons*, 957 F.2d 615
 (8th Cir. 1992)................................................................ 21

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)........................................... 6

*United States v. McKinney*, 980 F.3d 485
 (5th Cir. 2020).................................................................. 10

*United States v. Moore*, 795 F.3d 1224
 (10th Cir. 2015)................................................................ 22

*United States v. Mostowicz*, 471 Fed. Appx. 887
 (11th Cir. 2012) (unpublished) ................................................. 21

*United States v. Olivera-Mendez*, 484 F.3d 505
 (8th Cir. 2007)................................................................. 21

*United States v. Outlaw*, 319 F.3d 701
 (5th Cir. 2003)................................................................. 11

*United States v. Owens*, 917 F.3d 26
 (1st Cir. 2019) ................................................................ 22

*United States v. Perez-Melis*, 882 F.3d 161
 (5th Cir. 2018)................................................................. 11

*United States v. Pierce*, 622 F.3d 209
 (3d Cir. 2010).................................................................. 21

*United States v. Place*, 462 U.S. 696 (1983) ........................................ 4-5

*United States v. Rashaad*, 772 Fed. Appx. 176
 (5th Cir. 2019) (unpublished) ............................................... 10-11

**CASES – (cont'd)**

*United States v. Reed*, 141 F.3d 644
  (6th Cir. 1998)........................................................................ 21

*United States v. Richmond*, 915 F.3d 352
  (5th Cir. 2019)................................................................. *passim*

*United States v. Rivas*, 157 F.3d 364
  (5th Cir. 1998)................................................................. 15-16

*United States v. Seybels*, 526 Fed. Appx. 857
  (10th Cir. 2013) (unpublished) ............................................ 20

*United States v. Sharp*, 689 F.3d 616
  (6th Cir. 2012)........................................................................ 21

*United States v. Shen*, 749 Fed. Appx. 256
  (5th Cir. 2018) (unpublished) .........................................21-22

*United States v. Stone*, 866 F.2d 359
  (10th Cir. 1989)..................................................................... 21

*United States v. Taylor*, 934 F.2d 218
  (9th Cir. 1991)....................................................................... 11

*United States v. Urbina-Fuentes*, 900 F.3d 687
  (5th Cir. 2018)....................................................................... 18

*United States v. Ventura*, 447 F.3d 375
  (5th Cir. 2006)....................................................................... 11

*United States v. Winningham*, 140 F.3d 1328
  (10th Cir. 1998)..................................................................... 22

*United States v. Yusuf*, 57 F.4th 440
  (5th Cir.), *cert. denied*, 143 S. Ct. 1793 (2023).................... 11

**TABLE OF CITATIONS – (cont'd)**

**CONSTITUTIONAL PROVISION**

U.S. Const. amend. IV ....................................................................*passim*

**RULE**

Fed. R. Crim. P. 52(b) ............................................................... 18

**MISCELLANEOUS**

Br. for Petitioner, *Florida v. Harris*, 568 U.S. 237,
2012 WL 3027354 (June 25, 2012) ...................................... 14

**STATEMENT OF THE REPLY ISSUE**

Whether the district court reversibly erred by denying Mr. Keller's motion to suppress evidence.

# ARGUMENT

**REPLY ISSUE RESTATED**: The district court reversibly erred by denying Mr. Keller's motion to suppress evidence.

In his opening brief, Mr. Keller began by arguing that the district court reversibly erred by denying his motion to suppress evidence because the government conducted a warrantless, nonconsensual, suspicionless search of Mr. Keller's GMC in the primary lane of an interior immigration checkpoint for two reasons. First, K-9 Jagus's sniff of Mr. Keller's GMC in the primary lane constituted a search because the government's own witness—Matthew B. Devaney, the research and development coordinator for the Border Patrol Canine Academy—testified that K-9 Jagus was trained to detect legal activity, thus distinguishing the sniff in this case from the "non-search" sniff by a narcotics-detection dog in *Illinois v. Caballes*, 543 U.S. 405 (2005), that could only detect contraband. Br. for Appellant ("Def. Br.") 18-23. Second, Agent Sandoval and K-9 Jagus's conduct in primary constituted an unlawful search because it amounted to a trespass under *United States v. Jones*, 565 U.S. 400 (2012), and *United States v. Richmond*, 915 F.3d 352 (5th Cir. 2019). Def. Br. 23-25.

Alternatively, Mr. Keller argued that K-9 Jagus's behavior in the primary lane did not provide probable cause to search Mr. Keller's GMC in secondary for two reasons. First, the government failed to prove that Border Patrol is a bona fide organization to train dogs on the detection of concealed humans in the primary area,

again based on the testimony of the government's own witnesses. Def. Br. 25-29. Second, K-9 Jagus never performed his trained indication behavior of sitting in primary, and so his behavior there did not constitute a true alert giving rise to the presumption of probable cause. Def. Br. 29-33. For any of these reasons, the Court should reverse the district court's denial of Mr. Keller's motion to suppress evidence, vacate his conviction, and remand for further proceedings.

This reply brief will proceed by addressing the key facts the government has omitted from in its brief, and explain why those facts are necessary to resolving this appeal. It will then respond to the government's briefing on the trespass argument.

## A. The government's brief omits and fails to address key facts about Border Patrol's "secondary sniff" procedure.

In its brief, the government omits, and fails to address, essential evidence from its own witnesses, both Agent Sandoval and Mr. Devaney, that the "secondary sniff" is a critical part of Border Patrol's protocol. As Mr. Keller recounted in his opening brief (Def. Br. 12-15, 20-21, 28 [1]), Sandoval testified that he would search Mr. Keller's GMC only after his K-9 alerted in secondary "once all visible occupants" were "removed from that vehicle in [s]econdary." ROA.473. Sandoval further testified that if his K-9 does not alert in secondary, "I walk away." ROA.474-475. That's how critical the secondary sniff is to Border Patrol checkpoint

---

[1] Mr. Keller's opening brief inadvertently misspelled "Devaney" as "Delaney."

operations: even if his K-9's behavior in primary caused Sandoval to refer a vehicle to secondary, Sandoval would abandon his investigation of that vehicle if his K-9 failed to alert in secondary.

Consistent with Sandoval, Devaney testified about how Border Patrol K-9s are trained to detect concealed people, explaining that "[a]lso built into [the] program is the procedure of the secondary step at checkpoints following primary alerts." ROA.639. And just like Sandoval did, Devaney testified that a vehicle would not be searched "until the secondary sniff is conducted with all visible occupants outside the vehicle and then another alert occurred." ROA.670.

These facts omitted from and not addressed in the government's brief are essential to the resolution of this appeal. Mr. Keller's first argument on appeal (Def. Br. 18-23) is that K-9 Jagus's sniff of his GMC in the primary lane constituted a Fourth Amendment search because (1) Devaney testified that Border Patrol K-9s trained to detect concealed humans will alert to lawful activity, such as a baby in a car seat that the K-9 cannot see and a person taking a nap in a vehicle's back seat that the K-9 cannot see and (2) "that's why" Border Patrol agents conduct the secondary sniff and do not search a vehicle until after all visible occupants have been removed and the K-9 alerts again in secondary. ROA.669-670.

The government claims that K-9 Jagus's sniff in primary was not a search under *Caballes* and *United States v. Place*, 462 U.S. 696 (1983). Br. of Plaintiff-

Appellee ("Gov't Br.") 27-30. But *Caballes* and *Place* are both distinguishable because, unlike Mr. Keller's case, those cases involved narcotics-detection dogs that disclosed "only the presence or absence of narcotics, a contraband item." *Caballes*, 543 U.S. at 409 (quoting *Place*, 462 U.S. at 707). *See* Def. Br. 19-21. The Supreme Court itself in *Caballes* stressed that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest." *Caballes*, 543 U.S. at 408 (emphasis by the *Caballes* Court) (internal quotation marks and citation omitted). Here, the record establishes that Border Patrol K-9s trained to detect concealed humans do not alert *only* to contraband, but also to lawful activity. ROA.669-670.

The government unsuccessfully attempts to dismiss *Kyllo v. United States*, 533 U.S. 27 (2001), as a case about homes only. *See* Gov't Br. 28-30. *Caballes* itself belies the government's claim. The Supreme Court in *Caballes* focused on the ability of the technology at issue to detect lawful versus only unlawful activity:

> [T]he use of a well-trained narcotics-detection dog—one that "*does not expose noncontraband items* that otherwise would remain hidden from public view," *Place*, 462 U.S., at 707—during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.

This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. *Kyllo v. United States*, 533 U.S. 27 (2001). *Critical to that decision was the fact that the device was capable of detecting lawful activity*—in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.*, at 38. *The legitimate expectation that information about perfectly lawful activity will remain private* is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals *no information other than the location of a substance that no individual has any right to possess* does not violate the Fourth Amendment.

*Caballes*, 409-410 (emphasis added). The way *Caballes* discussed *Kyllo* in these passages makes clear that, while home versus car was a factual distinction, the more significant legal distinction was the *Kyllo* device's ability to detect lawful activity versus the *Caballes* dog's ability to detect *only* contraband. In this case, based on the training of K-9 Jagus to detect concealed humans, his sniff in primary was "capable of detecting lawful activity," just like in *Kyllo*. While it is true that Fourth Amendment protections sometimes differ based on the home-or-car distinction, the government agrees with Mr. Keller that "probable cause is required before agents can search a car at the checkpoint." Gov't Br. 26 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 567 (1976); *United States v. Dovali-Avila*, 895 F.3d 206, 207 (5th Cir. 1990)); *accord* Def. Br. 19; *see also, e.g.*, *Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) ("One who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it.").

The government asserts that "[t]he potential for Jagus to alert to legal activity, i.e., a legitimate passenger sleeping under a blanket, does not transform the alert in the primary lane into a search under the Fourth Amendment." Gov't Br. 30-36 (emphasis added). But that's exactly what it does under the passages quoted above from *Caballes*. The device in *Kyllo* was "*capable of* detecting lawful activity," i.e., had *the potential* to detect lawful activity, and so its use constituted a Fourth Amendment search; the narcotics dog in *Caballes* did not have that capability, and so its use was not a Fourth Amendment search. The K-9 in Mr. Keller's case, like the device in *Kyllo*, was capable of detecting lawful activity and so its use was a Fourth Amendment search.

To support its argument, the government engages in a lengthy discussion of *Florida v. Harris*, 568 U.S. 237 (2013). *See* Gov't Br. 30-33. That discussion, however, is largely irrelevant. *Harris* was about field performance—the Supreme Court reversed the Florida Supreme Court's decision requiring the State to produce field performance records in every case to establish the K-9's reliability. *See, e.g.*, 568 U.S. at 240. Mr. Keller's argument is about training, not field performance. *See* Def. Br. 20-23. And that training includes the secondary sniff and alert because of the potential for the primary alert alone to detect lawful activity. Because Mr. Keller's argument is about training, not field performance, this Court's unpublished decision in *United States v. Lozano*, 761 Fed. Appx. 444 (5th Cir. 2019)

(unpublished), has no bearing on this case. *See* Def. Br. 22 (explaining that *Lozano* involved a dog that alerted to Xanax *in the field*, "even though not trained or certified to do so") (quoting *Lozano*, 761 Fed. Appx. at 447).

The government claims that the district court "credited Devaney's extensive testimony about how [Border Patrol] trained its dogs to detect concealed humans." Gov't Br. 32. Tellingly, the government then cites only ROA.638-40 and 658-59—omitting the portions of Devaney's testimony where he testified Border Patrol K-9s trained to detect concealed humans will alert to lawful activity and "that's why" the secondary sniff and alert are necessary before searching a vehicle. ROA.669-670.

Regarding the Colorado Supreme Court's decision in *People v. McKnight*, 446 P.3d 397 (Colo. 2019), the government contends that case "has no application here" because it was a state, not federal, case. Gov't Br. 34. The government goes on to cite federal district court cases that have not applied *McKnight* in federal prosecutions involving drug-detection dogs because marijuana remains illegal federally. Gov't Br. 34-36.

The government has missed the point. This case involves a Border Patrol K-9 trained to detect concealed humans, and the government's own witness testified that Border Patrol K-9s alert to lawful activity, such as babies in car seats or people napping under a blanket in the back seat. No law, state or federal, bars babies in car

seats or people napping under a blanket in the backseat.[2] The Colorado Supreme Court's analysis in *McKnight* is relevant and persuasive because it recognizes that, under *Kyllo* and *Caballes*, the determinative factor is whether the technology at issue—a thermal-imaging device or a trained K-9, respectively—can detect lawful activity. *See McKnight*, 446 P.3d at 408-10. And if the technology can detect lawful activity, as can Border Patrol K-9s in primary that are trained to detect concealed humans, its use constitutes a search. *Id.* at 410 ("Because a sniff from a dog trained to detect marijuana (in addition to other substances) can reveal lawful activity, we conclude that sniff is a search under [the Colorado Constitution] and must be justified by some degree of suspicion of criminal activity."). Here, because Agent Sandoval lacked suspicion or consent to conduct that search, it violated the Fourth Amendment and the evidence must be suppressed.

The "secondary sniff" facts omitted from the government's brief are also essential to the resolution of Mr. Keller's third argument on appeal—that the government failed to prove that K-9 Jagus was certified to detect concealed humans in the primary area by a "bona fide organization." Def. Br. 25-29. Contrary to Agent Sandoval's description of the agents' initial activities in secondary as a "pre-search," the agents in fact searched Mr. Keller's GMC when it first arrived in the secondary

---

[2] Assuming, of course, that the car seats are properly installed and the people napping are wearing a seatbelt. The government did not present any evidence that its Border Patrol K-9s could detect improperly installed car seats or people not wearing their seatbelts.

inspection area, before K-9 Jagus was given an opportunity to perform a secondary sniff and alert. *See* Def. Br. 5-7. Sandoval testified that he would have "walk[ed] away" had K-9 Jagus not alerted again in secondary. Even though Agent Sandoval had K-9 Jagus do a secondary sniff in this case and the K-9 briefly sat, by then it was too late for that alert to give rise to the requisite probable cause to search, because the search without probable cause or consent had already occurred. *See, e.g.*, *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020) (a Fourth Amendment intrusion "must be 'justified at its inception'" and the requisite level of suspicion "must exist *before* the initiation of" a search or seizure) (quoting *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004)). For its part, the government does not seem to take a clear position on whether the agents' so-called "pre-search" of Mr. Keller's GMC in the secondary inspection area is in fact a Fourth Amendment search. *See* Gov't Br. 8 (the government's only mention of the "pre-search" in its brief). Video evidence, however, clearly establishes that the agents physically intruded inside Mr. Keller's GMC *before* the secondary sniff occurred. *See* Def. Br. 5-7, 25-26.

The government mistakenly claims that Mr. Keller's "bona fide organization" argument "directly conflicts" with *United States v. Rashaad*, 772 Fed. Appx. 176 (5th Cir. 2019) (unpublished). Gov't Br. 53. The defendant in that unpublished case argued that "the canine was unreliable because: the dog initially failed to alert at one of the locations, but later did; and, there was no evidence of his performance in the

field from the date of his certification in January 2017 to the date of the search that March." *Rashaad*, 772 Fed. Appx. at 176. The defendant did not make any argument about whether Border Patrol qualified as a "bona fide organization" to certify K-9s on the detection of concealed humans in primary, and the Court therefore did not decide that unraised question. *See id.* at 176-78. Because Mr. Keller has raised the "bona fide organization" issue and the government failed to prove that condition precedent necessary to invoke the presumption of probable cause, the search of Mr. Keller's GMC when he arrived at secondary was unlawful, and the evidence obtained from it should have been suppressed.[3]

## B. The government's brief also omits and fails to address key facts about Border Patrol's training and certification process.

Not only are the "secondary sniff" facts discussed above essential to resolving Mr. Keller's appeal, but the government's brief also omits and fails to address vital

---

[3] Besides *Rashaad*, the government cites seven cases to purportedly show that courts "consistently recognize [Border Patrol's] use of its dogs to detect the present of concealed humans." Gov't Br. 51 (citing *United States v. Yusuf*, 57 F.4th 440 (5th Cir.), *cert. denied*, 143 S. Ct. 1793 (2023); *United States v. Perez-Melis*, 882 F.3d 161 (5th Cir. 2018); *United States v. Ventura*, 447 F.3d 375 (5th Cir. 2006); *United States v. Taylor*, 934 F.2d 218 (9th Cir. 1991); *United States v. Allende-Garcia*, 407 Fed. Appx. 829 (5th Cir. 2011) (unpublished); *United States v. Delgado*, 364 Fed. Appx. 876 (5th Cir. 2010) (unpublished); *United States v. Hernandez-Castillo*, 156 F.3d 1245, 1998 WL 516845 (10th Cir. 1998) (unpublished)). But the defendants didn't challenge the dog's training in any of those cases.

Nor did the defendant in *United States v. Clayton*, 374 Fed. Appx. 497 (5th Cir. 2010) (unpublished), cited at Gov't Br. 51-52, where the Court merely found no clear error in the district court's resolution of a factual dispute between the K-9 handler's testimony and a defense expert's affidavit on whether the K-9 had in fact alerted. Also inapposite is *United States v. Outlaw*, 319 F.3d 701 (5th Cir. 2003), cited at Gov't Br. 51-52, because *Outlaw* did not involve a K-9 detecting concealed humans but rather a "drug-detecting canine" that alerted to a suitcase, and the suitcase contained a type of drugs to which the dog was not trained to alert.

testimony from its witnesses establishing that Border Patrol K-9s are trained and certified based on indications, not alerts. That evidence must be considered to decide Mr. Keller's fourth argument on appeal—that K-9 Jagus's failure to perform his trained behavior of sitting in primary means that his behavior there did not give rise to the presumption of probable cause necessary to justify the search of Mr. Keller's GMC when he arrived at secondary. Def. Br. 25-26, 29-33.

As detailed in Mr. Keller's opening brief (Def. Br. 11-12, 29-33), Sandoval testified that, for the certification process, the K-9 does 17 searches and "can only get one miss and false *indication*" to pass. ROA.493 (emphasis added). Both Sandoval and Devaney testified that the evaluators change all the time, *see* ROA.464, 643, but that a particular K-9's unique alert is only known to people who spend enough time working with the dog. ROA.481-482, 674, 676. When describing the evaluation process, Devaney repeatedly described the K-9's behavior as "alerts *and indicates*." ROA.672-673 (emphasis added). And when describing the process for training dogs to detect concealed humans, Devaney testified that it includes the dog *indicating* before being rewarded: concealed people are introduced by "basically show[ing] the dog [the] reward object, run[ning] behind a door, let[ting] the dog run to the door, and then he *performs an indication*, the person hiding provides the reward." ROA.638-639 (emphasis added).

Also absent from the government's brief is Devaney's testimony that he could

not tell from watching the videos of the primary and secondary lanes whether K-9 Jagus had "alerted" in the Border Patrol sense. ROA.676. Moreover, Sandoval agreed with the prosecutor's questions that "usually when [Jagus] alerts *and then indicates*" at the checkpoint, he finds what Jagus has been trained to detect. ROA.534 (emphasis added).

Without acknowledging any of this testimony from its own witnesses, the government asserts that "[a] dog is tested on his alerts, not his indications" and cites only ROA.514. Gov't Br. 5. Mr. Keller flagged this in his opening brief, noting that "[a]lthough Agent Sandoval testified at one point during cross-examination that Jagus is tested on the 'alert,' not the indication, ROA.514, that is inconsistent with Sandoval's own testimony indicating that he lacked personal knowledge about how testing was done since he [was] 'not a certified K-9 instructor'; his testimony that evaluators are 'always changing'; his testimony that an 'alert' is 'unique' to the dog and that Jagus's 'alert' was something he had to learn by working with him; and Mr. De[v]aney's testimony. ROA.463-464, 481-482, 643, 672-673, 676." Def. Br. 32 n.3. It cannot be that evaluators like Devaney are testing and certifying K-9s on "alerts" in the Border Patrol sense when evaluators like Devaney cannot tell whether a K-9 has "alerted" in the Border Patrol sense.

The government attempts to dismiss the difference between an alert and an indication as meaningless, arguing that "[w]hether described in case law as an 'alert,'

a 'sniff,' an 'indication,' a 'signal,' or a 'positive reaction,' to the exterior of a car, the dog's unique behavior when it detects a trained odor is not a 'search' under the Fourth Amendment because it does not infringe upon legitimate privacy interests." Gov't Br. 27. The government is wrong. The record establishes that Border Patrol differentiates between an "alert" and an "indication." ROA.481-482, 623-624. But what Border Patrol calls an "indication" is what the Supreme Court meant when it used the term "alert" in *Florida v. Harris*. *See* Def. Br. 31. The Court in that case was not presented with Border Patrol's differentiation between an indication and alert, but the State of Florida's briefing demonstrates that the Supreme Court used the term "alert" to mean an indication or a true alert, not an "alert" in the Border Patrol sense: "[Handler] Officer Wheetley led [K-9] Aldo around the truck for a 'free air sniff' of the exterior of the vehicle. Aldo alerted near the driver's side door handle—becoming excited then *sitting, as he had been training to do over the course of hundreds of hours* in K-9 instruction for certain narcotics[.]" Br. for Petitioner 3, *Florida v. Harris*, 568 U.S. 237, 2012 WL 3027354 (June 25, 2012) (emphasis added). Furthermore, *Harris* held that it's the dog training and certification, not field performance, that matters most for probable cause. *See* 568 U.S. at 245-47. And, as explained above, the record in this case establishes that Border Patrol trains and certifies its K-9s on the indication, not the "alert" in the Border Patrol sense.

"Indication" in Border Patrol lingo is also what this Court meant when it said

"alert" in *Dovali-Avila*. There, the Court explained that detection "dogs are *trained to alert*—take a particular position or stance—only when the detect [concealed] contraband or people. When a dog *so trained alerts* in the near presence of a particular vehicle, that action is sufficient to give rise to probable cause to search that vehicle." 895 F.3d at 208 (emphasis added); *see also id.* at 207 n.2 ("[d]etection dogs . . . are *trained* to 'alert'—that is, to take a distinctive position or stance, as in the instance of a *trained* bird dog pointing game—when they detect the scent of drugs or concealed humans) (emphasis added). The government's evidence in this case, however, demonstrated that Border Patrol does not *train* its K-9s to "alert" in the Border Patrol sense, because Border Patrol defines "alert" as "a combination of *instinctual* behaviors *unique* to the K-9" that are not trained and "[d]epends on the dog." ROA.623-624 (emphasis added). Only by working with the K-9 does a handler learn their dog's unique "alert." ROA.481-482, 674. And Devaney, the research and development coordinator for the Border Patrol Canine Academy since 1992, ROA.616, cannot identify K-9 Jagus's alert by watching the primary and secondary videos. ROA.676.

Moreover, this Court differentiated between a true alert in the *Harris*/*Dovali-Avila* meaning of the term, and other behavior falling short of a true alert, in *United States v. Rivas*, 157 F.3d 364 (5th Cir. 1998). *See* Def. Br. 29-30. There, the Court held that a "weak alert" or "casting" as it was called in that case, when the dog was

trained to perform an "aggressive alert," was *insufficient* to create probable cause. *Rivas*, 157 F.3d 368. The government's brief fails to address this argument in Mr. Keller's opening brief, and never even cites *Rivas*.

It is undisputed that K-9 Jagus's trained behavior was to sit, yet he never sat in primary. ROA.476, 481; Government Exhibit 1. Because K-9 Jagus did not alert in primary in the *Harris/Dovali-Avila* sense of that term, his behavior in primary did not give rise to the presumption of probable cause, the agents' search of Mr. Keller's GMC when he arrived at secondary violated the Fourth Amendment, and the evidence should have been suppressed.

## C.   The government's responses to Mr. Keller's trespass argument are unpersuasive.

Turning to Mr. Keller's trespass argument, the government argues that plain-error review applies, but does not brief the third or fourth prongs. *See* Gov't Br. 36-49. That omission makes sense, because Mr. Keller's case easily satisfies the third and fourth prongs. If the Court agrees that the district court clearly or obviously erred by not granting Mr. Keller's motion to suppress evidence, that error affected Mr. Keller's substantial rights and seriously affected the fairness, integrity, and public reputation of the proceedings.

A plain error affects substantial rights when there exists "a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (quoting

*United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82 (2004)). Here, Mr. Keller entered a conditional guilty plea, expressly preserving his right to appeal the suppression ruling. ROA.689, 700-704. Had the district court not erred by denying his motion to suppress evidence, the outcome of the proceeding would have been different because he would not have pleaded guilty.

When the first three prongs are met, "the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018) (quoting *Molina-Martinez*, 578 U.S. at 194). The facts of this case meet that standard. If the Court agrees that the district court clearly erred by denying Mr. Keller's motion to suppress evidence and that he would not have pleaded guilty absent that error, then Mr. Keller's conviction rests on unconstitutionally obtained evidence. Not correcting the error by vacating his conviction would therefore seriously affect the fairness, integrity, and public reputation of judicial proceedings. Moreover, this Court has held that, "under the plain error inquiry, errors of constitutional dimension will be noticed more freely than less serious errors." *United States v. Knowles*, 29 F.3d 947, 951 (5th Cir. 1994) (citations omitted); *see also, e.g.*, *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.

1991).[4]

On the second prong, the error is plain under *United States v. Jones*, 565 U.S. 400 (2012), and *United States v. Richmond*, 915 F.3d 352 (5th Cir. 2019). *See, e.g.*, *United States v. Urbina-Fuentes*, 900 F.3d 687, 692-98 (5th Cir. 2018) (finding plain error under Supreme Court case that "changed the game"). This Court in *Richmond* recognized that *Jones* caused "a sea change" in Fourth Amendment jurisprudence that required courts to now consider whether conduct was a search because it was a "trespass . . . 'conjoined' with 'an attempt to find something or obtain information.'" *Richmond*, 915 F.3d at 357 (quoting *Jones*, 565 U.S. at 408 n.5). The facts of this case clearly fall outside the exclusion from *Jones* for "mere physical touching, such as when an officer leans on the door of a car while questioning its driver, from being a search." *Id.* K-9 Jagus's paws on Mr. Keller's bumper was a trespassory touching since it occurred while Agent Sandoval was obviously deploying K-9 Jagus to gather information "to learn what was inside" Mr. Keller's GMC. *Id.* at 367-360. To learn about what is inside vehicles is the whole point of deploying K-9s at checkpoints.[5]

---

[4] *See also, e.g.*, *United States v. Hauk*, 412 F.3d 1179, 1197 (10th Cir. 2005) (in discussing fourth-prong of plain-error review, the Tenth Circuit noted that "if the underlying right is constitutional, we are more likely to conclude that a remand would be appropriate") (citations omitted); *United States v. Calfon*, 607 F.2d 29, 31 (2d Cir. 1979) (constitutional errors are generally more "substantial" within the meaning of Fed. R. Crim. P. 52(b), than nonconstitutional errors).

[5] The government cites ROA.413 n.4 as the district court's finding "that Agent Sandoval took no intentional action leading Jagus to the SUV, unlike the intentional acts of the officers in *Jones*" and *Florida v. Jardines*, 569 U.S. 1 (2013). Gov't Br. 44. The government's brief lifts that

The government suggests that the Court should not consider Mr. Keller's trespass argument at all because the Supreme Court in *Harris* "declined to review a new probable cause challenge to a dog alert." Gov't Br. 36. What happened in *Harris*, however, is that the petitioner "declined to challenge in the trial court any aspect of [the K-9's] training" and tried to, for the first time in the Supreme Court, question "just how well [the K-9] performed in controlled testing." 568 U.S. at 248-49. In those particular circumstances, the Supreme Court would not engage with the new argument. *Id.* at 249. That is a far cry from the situation we have here, where the trespass argument is based on uncontested video evidence offered by the government in the district court showing K-9 Jagus's paws touching the bumper of Mr. Keller's GMC in the primary lane, while Agent Sandoval was undoubtedly trying "to learn what was inside" the GMC.

The government attempts to transform Mr. Keller's trespass argument into a credibility determination by the district court. Gov't Br. 37-40. That attempt fails. As discussed above, the term "alert" as used in *Harris* and *Dovali-Avila* means the

---

footnote from an entirely separate, irrelevant context. That footnote was addressing Mr. Keller's district court argument "that Agent Sandoval cued, or encouraged, Jagus to 'pay particular attention to the rear of [Mr. Keller's] vehicle." ROA.413 n.4. The district court found that Sandoval did not cue K-9 Jagus. ROA.413 n.4. On appeal, Mr. Keller has not argued that Sandoval cued his K-9. For purposes of the *Richmond* and *Jones* trespass analysis, the question is whether Agent Sandoval was using K-9 Jagus to attempt to obtain information about what was inside Mr. Keller's GMC. There is no doubt that he was, since Border Patrol K-9s like Jagus are trained to detect the presence of concealed humans, and Agent Sandoval referred Mr. Keller's vehicle to secondary after K-9 Jagus alerted in the Border Patrol sense of that term.

K-9's trained behavior, or an "indication" in Border Patrol's terminology. Agent Sandoval's testimony using Border Patrol's unique definition of "alert" does not change what those cases said or meant. The true alert of K-9 Jagus's performing his trained behavior did not occur until after the trespass had already occurred.

The government's citation to a footnote in an unpublished, out-of-circuit case does not help its argument. *See* Gov't Br. 42 (citing *United States v. Seybels*, 526 Fed. Appx. 857, 859 n.1 (10th Cir. 2013) (unpublished)). According to the government, the Tenth Circuit in that footnote "explicitly recognized that a dog's entry onto the home's curtilage under a property-based analysis ... has no application to a dog alert to a car's exterior, which is governed [by] the reasonable-expectation-of-privacy analysis in *Caballes*." Gov't Br. 42. But this Court in its published decision in *Richmond* has held that the *Jones* trespass test applies to an officer's contact with a vehicle's exterior during a traffic stop: "Rightly or wrongly, *Jones* held that a trespassory search implicates the Fourth Amendment *even if it does not offend privacy interests*. Under that property-based approach, [the state trooper's] tapping of the tire was a search regardless of how insignificant it might seem." *Richmond*, 915 F.3d at 359.

The government's argument that the "brief touching of Jagus's paws on the rear bumper" is too insignificant to amount to a trespass, Gov't Br. 44, cannot be squared with *Richmond*. In that case, this Court already rejected that same argument,

recognizing that the state trooper's touching of the tire could be viewed "as relatively minor," just like the "relatively minor" "physical intrusion" of the attachment of the GPS device to the vehicle in *Jones*. *Richmond*, 915 F.3d at 358. Nevertheless, the Court in *Richmond* held that the "'relatively minor' act of tapping tires" was a trespass—and a search "[b]ecause that trespass occurred to learn what was inside the tires." *Id.*; *see also id.* at 359 (holding that, under the *Jones* test, the state trooper's "tapping of the tire was a search *regardless of how insignificant it might seem*") (emphasis added).

Relying on a string cite of irrelevant cases, the government claims that numerous courts "agree that absent police misconduct, the instinctive action of a trained canine including putting its paws on the car's exterior or even jumping inside a car to search for contraband, does not violate the Fourth Amendment." Gov't Br. 45.[6] All of the government's cited cases are inapposite. Not a single one cites *Jones*. None use the word "trespass." By contrast, Mr. Keller relied on in his opening brief *State v. Dorff*, 526 P.3d 988, 991 (Id. 2023), *cert. denied*, No. 22-1226, 2023 WL 6379020 (U.S. Oct. 2, 2023), a case where the Idaho Supreme Court conducted the

---

[6] Citing *United States v. Guidry*, 817 F.3d 997 (7th Cir. 2016); *United States v. Sharp*, 689 F.3d 616 (6th Cir. 2012); *United States v. Pierce*, 622 F.3d 209 (3d Cir. 2010); *United States v. Olivera-Mendez*, 484 F.3d 505 (8th Cir. 2007); *United States v. Reed,* 141 F.3d 644, 650 (6th Cir. 1998); *United States v. Lyons*, 957 F.2d 615 (8th Cir. 1992); *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989); *United States v. Shen*, 749 Fed. Appx. 256 (5th Cir. 2018) (unpublished); *United States v. Mostowicz*, 471 Fed. Appx. 887 (11th Cir. 2012) (unpublished).

trespass analysis required by *Jones* and held that a drug dog's physical contact with a vehicle while conducting a "free air" sniff "plain[ly]" constituted a "trespassory touching" and an unconstitutional search. Def. Br. 24-25 (citing *Dorff*, 526 P.3d at 991, 994, 996, 999).

The government further claims that "this Court and other circuit and district courts continue to apply the incidental-contact rule in the absence of police misconduct even after *Jones* and *Jardines*," citing several more circuit court cases and *Shen* again. Gov't Br. 45-46. Again, all of the circuit court cases are inapposite because none cite *Jones* or mention the word trespass.[7]

The out-of-circuit district court cases on which the government relies[8] are wholly unpersuasive. Two directly conflict with *Richmond*. This Court in *Richmond*, unlike the district court in *Acuna*, held that a trooper's "relatively minor," seemingly "insignificant" contact with the defendant's vehicle was a trespass, even though that contact did not cause any damage. *Compare Richmond*, 915 F.3d at 356-59, *with Acuna*, 2022 WL 3081419, at *6 (rejecting the defendant's claim in large part because the K-9's touching of the vehicle "obviously caused no damage

---

[7] *See United States v. Owens*, 917 F.3d 26 (1st Cir. 2019); *United States v. Moore*, 795 F.3d 1224 (10th Cir. 2015); *Shen*, 749 Fed. Appx. 256; *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998).

[8] *United States v. Anderson*, 658 F. Supp. 3d 1000 (D. Kan. 2023), *reconsideration denied*, No. 22-10006-01-JWB, 2023 WL 3092583 (D. Kan. Apr. 26, 2023); *United States v. Acuna*, No. 21-10035-01,02-JWB, 2022 WL 3081419 (D. Kan. Aug. 3, 2022); *United States v. Cordero*, No. 5:13-CR-166, 2014 WL 3513181 (D. Vt. July 14, 2014).

whatsoever"). And the Court in *Richmond*, unlike the district court in *Cordero*, squarely held that government conduct can satisfy the *Jones* trespass test even when that conduct did not implicate a reasonable expectation of privacy. *Compare Richmond*, 915 F.3d at 355-57, *with Cordero*, 2014 WL 3513181, at *8-*10 (relying solely on the reasonable-expectation-of-privacy test to reject the defendant's claim involving a traffic stop).

The third district court case involved materially different facts. In *Anderson*, the K-9 "momentarily touched the driver's side door of the car with his paws at one point"—contact that the district court described as "incidental, and no more objectionable than if an officer brushed up against the side of a vehicle during a traffic stop." 658 F. Supp. 3d at 1014. The video in Mr. Keller's case shows that K-9 Jagus did not momentarily, incidentally brush up against his GMC, but rather placed his paws on the bumper of the GMC as an integral part of Agent Sandoval and K-9 Jagus's investigation to learn what was inside Mr. Keller's vehicle. *See* GX1. Moreover, none of these district courts had the benefit of the Idaho Supreme Court's decision in *State v. Dorff*, 526 P.3d 988 (Id. 2023), where the Court applied *Jones* to hold that a drug dog's physical contact with a vehicle while conducting a "free air" sniff was an unconstitutional search. *See* Def. Br. 24-25 (discussing *Dorff*).

Finally, the government's argument that the trespass occurred after the alert (Gov't Br. 37-40) is factually incorrect. Agent Sandoval testified, while narrating

the video of Mr. Keller's vehicle in the primary lane of the checkpoint, as follows: "Right there – freeze that frame. At that point, Jag[u]s is *still alerting. He puts his paws on the bumper of the vehicle* and is trying to jump into the vehicle while sniffing every seam within the back hatch and the window." ROA.472 (emphasis added). K-9 Jagus's paws on the bumper while "still alerting" and while Agent Sandoval was deploying K-9 Jagus to learn about what was inside Mr. Keller's vehicle was obviously a trespass, and the evidence obtained as a result of that unlawful search should have been suppressed. The Court should therefore vacate Mr. Keller's conviction and remand for further proceedings.

## CONCLUSION

For the reasons stated in Mr. Keller's briefs, this Court should vacate Mr. Keller's conviction and remand for further proceedings.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ Kathryn Shephard
KATHRYN SHEPHARD
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002-1056
Telephone: (713) 718-4600

**CERTIFICATE OF SERVICE**

All parties required to be served with copies of this document have been so served by filing via the Fifth Circuit ECF filing system.

s/ Kathryn Shephard
KATHRYN SHEPHARD

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,126 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 (current version) software in Times New Roman 14-point font in text and Times New Roman 12-point font in footnotes.

3.     This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because the brief has been redacted of any personal data identifiers.

4.     This brief complies with the electronic submission of 5th Cir. R. 25.2.1 because this brief is an exact copy of the paper document.

5.     This brief is free of viruses because the brief has been scanned for viruses with the most recent version of a commercial virus scanning program.

s/ Kathryn Shephard\
KATHRYN SHEPHARD